# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| MARY ALICE GARRETT,<br>    Plaintiff | )<br>)<br>) |
| v. | )   Civil Action No. 2:04cv00100<br>)   **MEMORANDUM OPINION**<br>)<br>) |
| JO ANNE B. BARNHART,<br> Commissioner of Social Security,<br>    Defendant | )<br>)   By:   P<small>AMELA</small> M<small>EADE</small> S<small>ARGENT</small><br>)   United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Mary Alice Garrett, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Garrett initially filed an application for SSI on February 24, 2000.[1] (R. at 15.) The claim was denied initially, on reconsideration and by decision dated March 29, 2001. (Record, ("R."), at 15, 30-36.) On review, the Appeals Council affirmed the administrative law judge's, ("ALJ"), decision on March 12, 2002. (R. at 37-38.) Garrett again protectively filed an application for SSI on or about April 23, 2002, alleging disability as of October 1, 1999, based on "nerve" problems, panic attacks, poor concentration, shaking in her hands and back and hip pain. (R. at 62-64, 68.) Garrett's claim was denied both initially and on reconsideration. (R. at 41-43, 48, 49-51.) Garrett then requested a hearing before an ALJ. (R. at 52.) The ALJ held a hearing on January 30, 2004, at which Garrett was represented by counsel. (R. at 410-31.)

By decision dated February 26, 2004, the ALJ denied Garrett's claim. (R. at 15-21.) The ALJ found that Garrett had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Garrett had severe impairments, namely degenerative disc

---

[1]This application is not contained in the record.

disease, chronic back pain, a seizure disorder and a depressive disorder, but he found that Garrett did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20.) The ALJ further found that Garrett's allegations regarding her limitations were not totally credible. (R. at 20.) The ALJ found that Garrett had the residual functional capacity to perform light work,[2] involving simple, low-stress tasks that did not involve exposure to the public and that did not expose her to work at unprotected heights or hazardous machinery. (R. at 21.) The ALJ found that Garrett was unable to perform any of her past relevant work. (R. at 21.) Based on Garrett's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ further found that there were other jobs available in significant numbers in the national economy that Garrett could perform, including those of a maid, a janitor, a hand packer, an assembler, a sorter, a machine tender and a general laborer. (R. at 21.) Thus, the ALJ found that Garrett was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(g) (2005).

After the ALJ issued his opinion, Garrett pursued her administrative appeals, (R. at 11), but the Appeals Council denied her request for review. (R. at 5-8.) Garrett then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2005). The case is before this court on Garrett's motion for summary judgment filed April 8, 2005, and the Commissioner's motion for summary judgment filed May 5, 2005.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2005).

*II. Facts*

Garrett was born in 1959, (R. at 62, 413), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education. (R. at 74, 413.) Garrett has past relevant work experience as a housekeeper, a certified nurse's assistant and a cashier. (R. at 69, 413-16.)

Garrett testified that she used a walker due to unsteadiness caused by back, leg and hip pain. (R. at 416.) She stated that she could stand for only a few minutes without her walker, and that she needed it to get up. (R. at 425-26.) Garrett testified that she had to wear a heel lift because her right pelvis was twisted. (R. at 416.) She stated that she was on medication for high cholesterol, stomach problems and back and leg pain. (R. at 417.) She testified that she had short grand mal seizures two or three times a month, but that she could not afford to see a doctor for this problem. (R. at 418-19.) Garrett testified that she did not drive and that she lived alone. (R. at 419, 423.) She stated that she did not visit people because she had panic attacks. (R. at 422, 424.) Garrett stated that her condition had gotten worse since the last time she filed an application for SSI because of seizures and loss of mobility in her legs and back. (R. at 420, 424.)

Robert Spangler, a vocational expert, also testified at Garrett's hearing. (R. at 428-30.) Spangler was asked to consider a hypothetical individual of Garrett's age, education and work experience, who could perform light work, but who could not work at unprotected heights, who could not operate dangerous equipment or

-4-

machinery and who could perform only low-stress jobs that did not require regular interaction with the general public. (R. at 428-29.) Spangler testified that such an individual could perform jobs existing in significant numbers in the national economy, including the jobs of a light maid, a light janitor, a hand packer, an assembler, a grader, a sorter, a nonconstruction laborer and a production machine tender. (R. at 429.) Spangler also was asked to consider the same individual, but who was restricted as indicated in the mental assessment completed by state agency psychologist, Eugenie Hamilton. (R. at 244-46, 429-30.) Spangler testified that such an individual would not be able to perform any jobs. (R. at 429-30.) Spangler further testified that a Global Assessment of Functioning, ("GAF"), score of 50[3] would eliminate the aforementioned jobs. (R. at 430.)

In rendering her decision, the ALJ reviewed records from Dr. Randall E. Pitone, M.D.; Lee County Counseling Center; Dr. Harold Schultz, D.O.; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Gary Parrish, M.D., a state agency physician; Dr. E. James Kohl, M.D.; Physician Access; Lee County Community Hospital; and Dr. Ann Marie Mackway-Girardi, D.O. Garrett's attorney submitted additional medical records from Lee Regional Medical Center to the Appeals Council.[4]

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[4]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-5-

The record shows that Garrett was seen at Physician Access from January 3, 1995, to March 23, 1996. (R. at 283-301.) On November 29, 1995, Garrett complained of neck and shoulder pain along with problems sleeping. (R. at 289.) She was diagnosed with muscle spasms and insomnia. (R. at 289.) On December 19, 1995, Garrett complained of pain in both wrists and pain going down from her neck to her fingers. (R. at 287-88.) She was diagnosed with a cervical spasm. (R. at 287.) On January 3, 1996, Garrett stated that she felt weak and only slept a few hours each night. (R. at 287.) Garrett was diagnosed with depression, a muscle spasm in her neck and insomnia. (R. at 287.) On January 17, 1996, Garrett complained of problems sleeping and left arm and shoulder pain. (R. at 286.) She was diagnosed with insomnia. (R. at 286.) On January 31, 1996, Garrett again complained of neck and back pain. (R. at 285.) X-rays taken of both elbows revealed no evidence of abnormality. (R. at 290.) Garrett was diagnosed with insomnia and anxiety. (R. at 285.) On March 23, 1996, Garrett complained of being "shaky" and her mind going "blank." (R. at 283.)

From April 23, 2001, to April 24, 2003, Garrett was counseled by Shannon Moles, B.A., Angela Ledford, B.A. and Dr. Randall E. Pitone, M.D., at Lee County Counseling Center, ("LCCC"). (R. at 98-200.) On April 23, 2001, Garrett complained of depressive symptoms. (R. 188-95.) She was diagnosed with major depressive disorder. (R. at 193.) On May 15, 2001, Garrett was seen for an initial psychiatric evaluation. (R. at 178-83.) Dr. Pitone reported that Garrett was seen in 1989 for mood instability. (R. at 180.) In 1993, he noted that Garrett reported that she had been sexually abused as a child and complained of nerve problems as a result of the abuse. (R. at 180.) He also reported that a review of various office notes indicated that

Garrett often could not remember important details and events. (R. at 180.) Garrett reported that she was depressed, had panic-like episodes, felt nauseated and anxious and was concerned with her family situation. (R. at 181.) She admitted that she had thoughts of suicide, but denied any wish to end her life. (R. at 181.) Dr. Pitone diagnosed Garrett with major depressive disorder, anxiety disorder, not otherwise specified, possible sexual dysfunction secondary to early life sexual abuse and persistent back pain. (R. at 182.) On June 18, 2001, Garrett complained that she had not been sleeping well, but that her appetite had improved. (R. at 176.) She stated that she did not want to be around anyone, but denied being homicidal or suicidal. (R. at 176.) Dr. Pitone reported that Garrett appeared saddened and depressed. (R. at 176.) On June 27, 2001, Garrett reported that she had experienced some improvement with medications. (R. at 174.)

On July 2, 2001, Garrett complained that her medication was causing muscle cramps and pain. (R. at 172.) She appeared to be in a lot of pain. (R. at 172.) Dr. Pitone also reported that Garrett appeared to be clinically stable. (R. at 172.) On July 20, 2001, Garrett reported some improvement. (R. at 170.) She was reported as being friendly and in a better mood than usual. (R. at 170.) On August 3, 2001, Garrett reported that her Xanax had been stolen. (R. at 169.) She stated that she gave her husband the key to her medicine box so she would not be tempted to take all of her medication at once. (R. at 169.) Garrett showed signs of depression, and was tearful and shaky. (R. at 169.) On August 7, 2001, Garrett reported being very depressed due to her Xanax being stolen and other family problems. (R. at 166.) Garrett appeared anxious and tearful. (R. at 167.) Her mood was moderately depressed, and she was moderately to severely anxious. (R. at 167.) There was no evidence of psychosis or

cognitive impairment. (R. at 167.) On August 17, 2001, Garrett appeared mentally stronger. (R. at 164.) On August 28, 2001, Garrett appeared happy and did not report any nervousness or anxiety. (R. at 163.) On September 7, 2001, Garrett complained of problems sleeping and back and leg pain. (R. at 161.) She reported that her husband abused her and had threatened to kill her. (R. at 161.) Garrett was reported as crying constantly and appearing dirty. (R. at 161.) On September 12, 2001, Garrett was not tearful and seemed pessimistic instead of depressed. (R. at 159.) She stated that her family circumstances were improving. (R. at 159.)

On October 4, 2001, Garrett complained that her medical doctor refused to prescribe her pain medication. (R. at 155.) She was reported as being friendly, but totally unmotivated to help herself. (R. at 155.) Garrett's medical doctor, Dr. Ann Marie Mackway-Girardi, was contacted, and she reported that Garrett had been abusing her pain medications. (R. at 155.) On October 16, 2001, Garrett reported that she had occasionally taken more Xanax and Zyprexa than prescribed. (R. at 154.) On October 23, 2001, Garrett reported that she felt more depressed, irritable and anxious because she had been out of medicine for a week. (R. at 152.) On November 2, 2001, Garrett's daughter contacted LCCC stating that Garrett had tried to commit suicide. (R. at 143.) An emergency custody order was issued, and Garrett was involuntarily committed to Southwestern Virginia Mental Health Institute, ("Southwest"). (R. at 144-50.)

On November 21, 2001, Garrett reported feeling better and that her family circumstances had improved. (R. at 138.) On December 19, 2001, Garrett reported feeling paranoid that people were staring and talking about her. (R. at 136.) She was

-8-

Case 2:04-cv-00100-PMS   Document 19   Filed 08/11/05   Page 8 of 19   Pageid#: 79

mildly depressed with congruent affect. (R. at 136.) On January 29, 2002, Dr. Pitone reported that Garrett was still depressed and appeared to have a lot of anxiety. (R. at 133.) On June 10, 2002, Garrett complained of back problems as a result of painting. (R. at 115.) On June 30, 2002, Garrett called LCCC forcefully crying and stated that she wanted everyone to leave her alone. (R. at 113-14.) Garrett's husband believed Garrett was in need of hospitalization. (R. at 113.) Garrett missed her next five scheduled appointments. (R. at 107-08, 110-12.) On August 27, 2002, Garrett called to report that she had been out of medications for two weeks. (R. at 106.) She complained of mood swings. (R. at 106.) On August 28, 2002, Garrett called to report that her husband had beat her up and she was leaving him. (R. at 105.)

On September 3, 2002, Garrett complained of family problems and dizzy spells. (R. at 102.) She reported that her daughters were verbally and physically abusive to her. (R. at 102.) Her mood was depressed with congruent affect. (R. at 100.) She was stable on medication. (R. at 100.) On October 30, 2002, Dr. Pitone reported that he stopped prescribing Garrett Xanax because of questions about her compliance. (R. at 99.) Garrett complained of feeling more depressed and having problems sleeping. (R. at 99.)

On April 21, 2003, Dr. Pitone performed a mental assessment of Garrett. (R. at 196-200.) Dr. Pitone reported that Garrett had fair to poor hygiene. (R. at 198.) Dr. Pitone reported that Garrett's mood was usually mildly depressed and anxious. (R. at 198.) No memory deficits were reported. (R. at 198.) Dr. Pitone stated that Garrett had adequate judgment and was capable of managing her own funds. (R. at 200.) She was diagnosed with anxiety disorder, not otherwise specified, and major depressive

disorder. (R. at 196.)

On July 15, 2001, Garrett presented to the emergency room at Lee County Community Hospital, ("Lee County"), for complaints of back and hip pain. (R. at 343-46.) She was next seen on June 6, 2003, for complaints of a rib injury as a result from a fall. (R. at 314-21.) X-rays of Garrett's right rib cage showed no acute fracture. (R. at 321.) X-rays of Garrett's chest showed mild to moderate emphysema. (R. at 321.) She was diagnosed with a contusion to the left chest wall. (R. at 319.) On October 30, 2003, Garrett presented to the emergency room for complaints of right flank pain. (R. at 304-13.) X-rays of Garrett's right rib cage showed a healing fracture of the right ninth rib. (R. at 310.) X-rays of Garrett's chest showed mild emphysema and chronic changes. (R. at 310.) She was diagnosed with fracture of the right rib and musculoskeletal pain, low back. (R. at 309.) On March 29, 2004, Garrett complained of rib pain. (R. at 389-95.) Chest x-rays indicated no acute cardiopulmonary disease, but a mild chronic change was noted in the lung field that could be due to bronchitis. (R. at 395.) No new rib fractures were revealed. (R. at 395.) On July 17, 2004, Garrett was admitted to Lee County due to a motor vehicle accident from which she suffered a dislocation of her right elbow with lacerations along with facial lacerations. (R. at 396-408.) Garrett also complained of chest pain and left abdominal pain. (R. at 396.) She underwent CT scans of the chest and abdomen that revealed no injuries other than bruising to the chest. (R. at 396.)

On August 24, 2001, Garrett saw Dr. Ann Marie Mackway-Girardi, D.O., for complaints of "nerves," depression and back pain. (R. at 375.) She was diagnosed with chronic constipation, back pain, secondary to muscle spasms, sacral unleveling

and chronic gastritis. (R. at 374.) On September 13, 2001, Garrett complained of back pain and swelling in her hands and feet. (R. at 372.) She reported that her gastritis and constipation had improved. (R. at 372.) Garrett was diagnosed with gastritis, constipation, history of rectal bleeding, edema, right leg shorter than left and back pain. (R. at 371.) On December 14, 2001, Garrett complained of neck pain and spasms. (R. at 361.) She was diagnosed with cervical spasms, chronic back pain, gastritis and severe anxiety. (R. at 361.)

Garrett was admitted to Southwest from November 2, 2001, to November 5, 2001, as a result of a suicide attempt. (R. at 201-16.) On admission, she was diagnosed with depressive disorder, not otherwise specified, and given a GAF score of 25.[5] (R. at 213.) Her discharge diagnosis was adjustment disorder with depressed mood, and she was given a GAF score of 50. (R. at 205.)

The record shows that Garrett saw Dr. Harold E. Schultz, D.O., from April 1, 2002, to September 18, 2003. (R. at 217-43.) On April 1, 2002, Garrett complained of back and hip pain. (R. at 234.) Dr. Schultz reported that Garrett had tenderness in her lumbar spine. (R. at 234.) Garrett was diagnosed with possible seizure activity, bilateral hip pain and low back pain. (R. at 234.) She was referred to an orthopedist. (R. at 234.) On May 8, 2002, Garrett complained of seizures and continued back pain. (R. at 232.) She reported that she had not been taking her previously prescribed seizure medication because she could not afford it. (R. at 232.) Garrett was diagnosed with degenerative disc disease of the lumbar spine, chronic low back pain and seizure

---

[5]A GAF score of 21-30 indicates that the individual's "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment ... OR inability to function in almost all areas.... DSM-IV at 32.

disorder. (R. at 232.) On July 8, 2002, Garrett complained of extreme back pain and problems moving around. (R. at 230.) She was diagnosed with degenerative disc disease, depression, chronic low back pain, seizure disorder and constipation. (R. at 230.)

On September 4, 2002, Garrett returned to Dr. Schultz for pain management. (R. at 228.) She reported that her husband had abused her. (R. at 228.) Dr. Schultz reported that Garrett had tenderness in the right rib area. (R. at 228.) She was diagnosed with degenerative disc disease and anxiety. (R. at 228.) On October 2, 2002, Garrett continued to complain of right rib pain. (R. at 227.) Dr. Schultz made the same diagnoses along with probable fractured ribs. (R. at 227.) On October 29, 2002, Garrett complained of pneumonia and low back pain. (R. at 226.) Examination of Garrett's back showed tenderness in the lumbar spine and limited range of motion. (R. at 226.) She was diagnosed with degenerative disc disease of the lumbar spine and anxiety. (R. at 226.) On December 18, 2002, Garrett complained of having seizures about every three days, sinus problems and stomach problems. (R. at 224.) She stated that she had been unable to get her seizure medications.(R. at 224.)

On February 26, 2003, Garrett complained of continued seizures. (R. at 222.) She stated that she did not believe Lortab was controlling her pain and that she would like to have her pain medication increased. (R. at 222.) On March 26, 2003, Garrett complained of continued back pain and seizures. (R. at 221.) She stated that Ultram was helping her pain. (R. at 221.) On May 23, 2003, Garrett complained of seizures and back pain. (R. at 219.) She stated that she was not taking her seizure medication and only knew that she had a seizure if her underwear was wet. (R. at 219.) On July

-12-

18, 2003, Garrett complained of possibly having a seizure and low back pain. (R. at 381.) She was diagnosed with degenerative disc disease of the lumbar spine, chronic back pain, a history of seizure disorder and depression. (R. at 381.) On September 15, 2003, Garrett complained of excruciating pain down her legs and in her hips. (R. at 380.) She stated that her pain medication was not working. (R. at 380.) She was given a walker and prescribed Lortab, Xanax and Flexeril. (R. at 380.)

On November 13, 2002, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a mental assessment indicating that Garrett was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 244-46.) In all other categories of mental functioning, Hamilton found Garrett not significantly limited. (R. at 244-45.) This assessment was affirmed by Joseph Leizer, Ph.D., another state agency psychologist, on May 6, 2003. (R. at 246.)

Hamilton also completed a Psychiatric Review Technique form, ("PRTF"), indicating that Garrett suffered from an affective disorder and an anxiety-related disorder. (R. at 247-62.) Hamilton concluded that Garrett was only mildly restricted in her activities of daily living, experienced only moderate difficulties in maintaining social functioning, concentration, persistence or pace, and had experienced one or two

episodes of decompensation. (R. at 257.) Hamilton reported that Garrett was capable of simple, unskilled, nonstressful work. (R. at 259.) She also concluded that Garrett's mental allegation was partially credible. (R. at 259.) These findings were affirmed by Leizer on May 6, 2003. (R. at 247.)

On November 20, 2002, Dr. Gary Parrish, M.D., a state agency physician, indicated that Garrett had the residual functional capacity to perform medium work.[6] (R. at 263-72.) Dr. Parrish indicated that Garrett had the ability to frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 267.) He also indicated that Garrett should never climb ladders, ropes or scaffolds. (R. at 267.) There were no manipulative, visual or communicative restrictions placed on Garrett's work-related abilities. (R. at 268-69.) Dr. Parrish indicated that Garrett should avoid exposure to working around hazards such as machinery and heights. (R. at 269.) Dr. Parrish indicated that Garrett's complaints were partially credible. (R. at 265, 270.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician, on September 25, 2003. (R. at 272.)

On August 5, 2003, Dr. E. James Kohl, M.D., reviewed Garrett's PRTF, indicating that he agreed with all of Hamilton's findings within the PRTF administered on May 6, 2003. (R. at 273-80.) Dr. Kohl also reported that the residual functional capacity assessment of June 25, 2003, was orthopaedically reasonable. (R. at 279.)

---

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2005).

-14-

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 26, 2004, the ALJ denied Garrett's claim. (R. at 15-21.) The ALJ found that the medical evidence established that Garrett had severe impairments, namely degenerative disc disease, chronic back pain, a seizure disorder

-15-

and a depressive disorder, but he found that Garrett did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20.) The ALJ found that Garrett had the residual functional capacity to perform light work, involving simple, low-stress tasks that did not involve exposure to the public and that did not expose her to work at unprotected heights or hazardous machinery. (R. at 21.) The ALJ found that Garrett was unable to perform any of her past relevant work. (R. at 21.) Based on Garrett's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ further found that there were other jobs available in significant numbers in the national economy that Garrett could perform, including those of a maid, a janitor, a hand packer, an assembler, a sorter, a machine tender and a general laborer. (R. at 21.) Thus, the ALJ found that Garrett was not under a disability as defined in the Act, and that she was not entitled to benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(g) (2005).

Garrett argues that the ALJ's decision is not based on substantial evidence of record. (Motion For Summary Judgment And Memorandum Of Law On Behalf Of The Plaintiff, ("Plaintiff's Brief"), at 7.) In particular, Garrett argues that the ALJ erred by failing to find that a significant number of jobs exist that she could perform. (Plaintiff's Brief at 7-9.) Garrett also argues that the ALJ erred by failing to give proper weight to the opinions of her treating sources regarding her GAF score. (Plaintiff's Brief at 9-10.) Garrett further argues that the ALJ erred by failing to give proper weight to all of the treating and examining mental sources of record. (Plaintiff's Brief at 11-13.) Garrett argues that the ALJ erred by failing to consider the combined effects of her impairments. (Plaintiff's Brief at 14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

The ALJ in this case found that Garrett had the residual functional capacity to perform light, simple, low-stress jobs. Based on my review of the record, I find that substantial evidence exists to support this finding. Although the medical evidence shows that Garrett's physicians referred her for further evaluation, she refused to seek specialist care. In December 2001, Garrett's primary care physician noted that Garrett's failure to comply with consultation recommendations made it difficult to keep prescribing medication to her. (R. at 362.) Despite the reports of seizure activity, as late as May 2003, Garrett reported that she was not taking any kind of anti-convulsive medication. (R. at 219.) In April 2002, Garrett sought treatment from a new primary care physician because her former physician refused to prescribe pain medication for her due to her abuse of the medication. (R. at 234.) Additionally, the state agency physician opined that Garrett could perform medium work, which did not require work around hazards such as machinery and heights. (R. at 263-72.) None of the other physicians of record placed any restrictions on Garrett's physical work-

related abilities.

The ALJ found that while Garrett was reported to have a GAF score of 50, he found that this opinion was inconsistent with the treatment records which showed improvement in Garrett's symptoms with medication. (R. at 18.) In April 2003, Dr. Pitone noted that although Garrett complied with her medication regime, she had difficulty complying with her mental health appointments for various reasons. (R. at 98.) However, Garrett reported that she had stabilization of her symptoms with medication compliance. (R. at 98, 100, 138, 159, 163-64, 170, 174.) Although Garrett was hospitalized once, her mental examination revealed that her thought content and process, memory and insight were all within normal limits. (R. at 147.) Following her hospitalization, progress notes show that Garrett was doing "much better" with a euthymic mood. (R. at 140.) In November 2001, she reported that she was doing well, and it was reported that she had a euthymic mood with a congruent affect. (R. at 138.) In April and May 2002, despite family problems, Garrett's mood appeared euthymic with a congruent affect. (R. at 119, 124.) She was clinically stable. (R. at 124.) In July 2002, Garrett reported that she was taking her medication as prescribed and that she had no problems or concerns at that time. (R. at 111.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). It also is important to note that none of Garrett's treating mental health professionals ever placed any restrictions on her work-related activities. In addition, the state agency psychologist found that Garrett was capable of performing simple, unskilled, nonstressful work. (R. at 259.)

Based on the above, I find that substantial evidence exists in the record to

Case 2:04-cv-00100-PMS   Document 19   Filed 08/11/05   Page 18 of 19   Pageid#: 89

support the ALJ's findings as to Garrett's residual functional capacity.

## IV. Conclusion

For the foregoing reasons, Garrett's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:   This 11th day of August 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-19-

Case 2:04-cv-00100-PMS   Document 19   Filed 08/11/05   Page 19 of 19   Pageid#: 90